18517

GRIEVANCE COMMITTEE, CHARLESTON COUNTY BAR ASSOCIATION, Complainant, v. J. Louis LEMPESIS, Respondent

(148 S. E. (2d) 869)

*Messrs. Daniel R. McLeod, Attorney General,* and *Grady L. Patterson, Jr., Assistant Attorney General,* of Columbia, *for Complainants,*

*Robert A. Patterson, Esq.,* of Barnwell, *Whaley, Stevenson & Patterson,* of Charleston, *for Respondent,*

June -7, 1966.

## ORDER OF SUSPENSION

*Per Curiam:*

This matter involves a review of findings and recommendations of the Commissioners on the Grievances and Discipline, in which they recommended that the respondent J. Louis Lempesis, a member of the Bar of this State, be indefinitely suspended from the practice of law because of professional misconduct.

Of five separate charges originally filed against respondent, the Commissioners have found him guilty of two, absolving him of any misconduct as to the others. We are only con-

cerned with the two charges upon which the recommendation for disciplinary action is based.

The first charge involves alleged misconduct of respondent in connection with a real estate transaction in which he was personally and professionally involved. The respondent, individually and as agent for two business associates, entered into a contract with Mr. and Mrs. John W. Tanner wherein respondent and his associates agreed to purchase two lots owned by the Tanners at Folly Beach, South Carolina. It was agreed that the consideration for the sale would be paid partly by cash, partly by the assumption of an existing mortgage over each lot, and the balance to be secured by a second mortgage over the property.

On June 10, 1960, the Tanners, accompanied by their attorney, went to respondent's office to complete the sale. It developed that the execution of the second mortgage to secure the balance of the purchase price had not been completed. As a matter of convenience and because of their trust in him, the Tanners executed the deeds for the property to respondent and his associates and left them with respondent with the distinct understanding that he would obtain the execution of the second mortgage, have the instruments recorded, and deliver the mortgage to the Tanners' attorney.

Although the respondent held the deeds from the Tanners, the mortgage was never recorded or delivered by him as he agreed to do. Instead, it developed that thirteen months later, on July 10, 1961, respondent's associates in the purchase conveyed to him their interests in the Tanner properties and there was placed on record on February 2, 1962, a mortgage from respondent to Fenwick-Hills Corporation covering a portion of the Tanner property. In other words, instead of executing the mortgage to the Tanners to secure the purchase price of their property and placing it on record, as he agreed and they trusted him to do, respondent placed a mortgage on the property to someone else, thereby prejudicing the rights of the Tanners.

While the mortgage to the Tanners was not executed or recorded as respondent agreed, monthly payments were promptly made by him to the Tanners until some time in 1962 in accordance with the terms which were to have been included therein. Since payments were being made as agreed, apparently both the Tanners and their attorney assumed that respondent had sent the mortgage to the other and no inquiry was made thereabout until respondent defaulted in a payment in 1962. The Tanners and their attorney then discovered for the first time that respondent had not executed and recorded the mortgage as he had agreed to do and that he had placed a mortgage over the property to another party.

When the failure to execute the mortgage was brought to respondent's attention, he immediately, on May 17, 1962, executed a mortgage to the Tanners covering the property purchased from them, together with an adjacent lot and his residence property. This mortgage was junior in lien to other mortgages previously given by respondent over the covered properties and the value of the equities therein was very doubtful. At the time of the hearing before the Commissioners, respondent was still making payments to the Tanners on the indebtedness due them.

Respondent says that his failure to carry out his agreement with the Tanners and their attorney relative to the execution and recording of the mortgage was due to an oversight caused by the confusion surrounding his practice and personal situation at the time. He had entered into a business development at Folly Beach. His invesments in this business venture met with disaster and in attempting to salvage these investments he greatly over-extended himself financially. At the same time, his law partnership dissolved. The Commissioners in their report summarized respondent's situation during the period in question as follows: "We must admit that Respondent's personal financial life was at this time tangled and confused. It appears that his investments in the Folly Beach Motels, Inc. and Folly Beach Ocean Plaza, Inc. met with disaster and that in attempting to salvage

these investments he greatly over-extended himself financially. The Ocean Plaza foreclosure resulted in the complete dissolution of long friendships. His law partnership dissolved under circumstances, which while not detailed before the panel, clearly indicated ill feeling and harsh measures. His law office building was foreclosed upon, as was his residence property and other properties in which he had investments. It appears that respondent was being hounded by his creditors and harassed by debts. We recognize the difficulties and confusions which normally arise in the dissolution of a law partnership and the relocation of a legal office and are not without sympathy for the respondent in his plight."

The Commissioners concluded however that the actions of respondent in connection with the Tanner mortgage could not be condoned and that such conduct warranted disciplinary action. We agree. The Tanners conveyed their property to respondent on June 10, 1960. We will assume that, through oversight, respondent may have failed to execute the Tanner mortgage from June 10, 1960, until May 17, 1962, when he placed another mortgage over the property. However, at that time, the existence of prior liens over the property of necessity arose and the failure of respondent to then realize that he had not executed and recorded the Tanner mortgage could not longer be attributed to an oversight on his part. The respondent simply failed to discharge the trust placed in him. The personal financial crisis under which he was laboring at the time did not excuse such failure.

The final charge relates to respondent's handling of two cases arising out of an automobile accident. On August 3, 1958, Mr. Rollin B. Posey and his wife, Elizabeth D. Posey, then residents of the State of Illinois, were involved in an automobile accident in or near Charleston, South Carolina. They employed respondent to represent them, entering into a written contract to that effect. It appears that the Poseys had incurred indebtedness arising out of the collision, which they were unable to pay without changing their travel

plans, and respondent personally guaranteed the payment of these bills so as to permit the Poseys to leave. Respondent testified that, in view of the foregoing, he altered his standard contract of employment so as to give him full authority to act for Mr. and Mrs. Posey in matters connected with the handling of their claims. The written contract could not be located and was apparently misplaced in the confusion surrounding the dissolution of respondent's law partnership and the office moves necessitated thereby.

After preliminary negotiations for settlement failed, respondent instituted actions about August 28, 1959, on behalf of both Mr. and Mrs. Posey. The complaints were purportedly verified by the Poseys and their signatures sworn to before respondent. However, the respondent admitted that the signatures on the verifications to the complaints were not those of the respective plaintiffs and that he either signed or caused their names to be signed thereto. His explanation for signing the names of the plaintiffs to the verification was that he considered that he had authority under his contract of employment to act in all matters for them.

On October 6, 1961, respondent without the knowledge of the plaintiffs settled the cases with defendant's attorneys for the sum of $5,750.00, and on October 20, 1961, signed or caused to be signed the names of the plaintiffs to releases for the settlement in each case, with respondent's name appearing as a witness to the purported signatures. Drafts in payment of the settlement were delivered to respondent and, after endorsing or causing to be endorsed the plaintiffs' names thereon, he presented them for payment. The funds were deposited by respondent in an attorney's "special account" and later transferred, because of his position with his creditors, to an account in a Columbia Bank. It is admitted that the respondent did not advise the defendant's attorneys that the signatures on the releases and the drafts were not those of the plaintiffs, nor were they advised of any special circumstances which would give respondent authority to so sign for his clients.

Respondent subsequently contacted the plaintiffs and they agreed to settle the cases for the figure previously accepted by him, but the plaintiff's deny that they were told at that time that the cases had already been settled. The record contains testimony of repeated efforts by the plaintiffs to contact respondent after they agreed to accept the settlement, culminating in a trip to Charleston by Mr. Posey on July 10, 1962. On July 11, 1962, approximately nine months after respondent received the funds in settlement of the cases, he paid to plaintiffs their portion of the settlement together with his personal check for their expenses.

The Poseys, apart from the fact that they did not get their money until July 1962, expressed satisfaction with respondent's representation, executed a confirmatory release, and refused to join in bringing any action against him. However, after receiving satisfactory distribution from respondent on July 11, 1962, the Poseys became concerned over whether or not they had been advised of the full amount of the settlement and wrote to defendant's attorneys to confirm the amount thereof. As a result of this correspondence, the details surrounding the execution of the releases and the endorsement of the drafts were learned, resulting in this inquiry into respondent's conduct.

Respondent justifies his execution of the releases and endorsement of the drafts upon the full authority which he claimed to have to handle the litigation of his clients. He attributes the delay in remitting the settlement to his clients to mere oversight and inadvertence.

Further review here of the record in this connection would serve no useful purpose. Aside from questions concerning the authority of respondent to sign his clients' names to the verifications on the complaints, we agree with the finding of the Commissioners that respondent lacked authority (1) to settle the litigation on behalf of his clients without their consent, (2) to sign their names to the releases, or (3) to endorse their names to the settlement drafts. Such conduct not

only constituted a breach of his duty and responsibility to his client, but resulted in inducing a fellow practitioner (defendant's attorney) to pay over the amount of the settlement in reliance upon the validity of the signatures which respondent purportedly obtained. Neither can the failure of respondent to remit the settlement proceeds to his client until approximately nine months later be justified under this record.

After a careful review of the record, we have concluded that the conduct of the respondent warrants disciplinary action. There remains the question of the form such action should take. The Commissioners have recommended indefinite suspension.

The record contains substantial testimony as to respondent's good character and professional ability. Although complete restitution for the damage caused has not been made, he is apparently in good faith attempting to do so. While his conduct cannot be attributed to mere oversight and inadvertence, we agree with the finding of the Commissioners "that respondent became involved in a series of confused, complex and disasterous financial ventures which adversely affected his practice, preoccupied his mind and beclouded his judgment to the detriment of those who had placed in him their trust and confidence." Under all of the circumstances, the conduct of respondent does not warrant disbarment but does justify his indefinite suspension as provided in Section 5 of the Rule on Disciplinary Procedure.

It is therefore ordered that the respondent be, and is, indefinitely suspended from the practice of law in this State and shall forthwith surrender to the Clerk of this Court the certificate heretofore issued by this Court admitting him to practice.